Filed 6/30/25  P. v. Olivarria CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C098553 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE016166) |
| v. | |
| LOUIS OLIVARRIA, | |
| Defendant and Appellant. | |

A jury found defendant Louis Olivarria guilty of one count of lewd and lascivious acts on a child under 14 years old.  The jury further found true aggravating circumstances that defendant's victim was particularly vulnerable and defendant's conduct indicated a serious danger to society.  The court imposed the upper term of eight years.  On appeal, defendant contends the trial court erred by reseating a juror he challenged with a peremptory challenge, discharging a juror for failing to deliberate, and admitting a prior bad act into evidence.  Defendant further contends substantial evidence does not support

1

the jury's aggravated circumstance finding that the victim was particularly vulnerable. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

When A.D. was 10 years old, she went to her aunt's house for a party that was attended by dozens of people, including children. Throughout the day, A.D. played with her 11-year-old cousin D.D. and other children both inside and outside the house. Defendant also attended the party, however, he had never met A.D. or D.D. before. Earlier in the day, defendant showed A.D. and D.D. his watch and a picture of his niece. At one point, D.D. went into the kitchen and defendant lifted her up and tickled her on her stomach and armpits. A.D. saw the interaction and was left with a bad feeling because defendant would not let D.D. go while he tickled her.

Later in the day, A.D. and D.D. were in the kitchen. They playfully threw defendant's beanie back and forth while defendant playfully tried to grab the beanie from them. The game lasted approximately five to 10 minutes before A.D. and D.D. went upstairs to find another cousin to play with. Defendant followed A.D. and D.D. upstairs, which caused them to become uneasy about defendant.

Once upstairs, D.D. noticed there was nobody else there. A.D. and D.D. ran to a closet in their cousin's room to hide from defendant. Defendant entered the room and said he could hear them. He then opened the closet door and both A.D. and D.D. ran to another bedroom to get away from defendant. Once in the other bedroom, A.D. and D.D. ran into the closet. Defendant came into that bedroom as well and opened the closet where A.D. and D.D. were hiding. Defendant grabbed both A.D. and D.D. by the arm and ushered them into the hall bathroom, which consisted of a room with a sink and a separate room containing a toilet and bathtub. A.D. and D.D. ran into the toilet portion of the bathroom and closed the door, with A.D. holding it shut.

D.D. said she needed to go to the bathroom and proceeded to use the toilet. Defendant opened the door and D.D. jumped off the toilet and pulled up her pants.

2

Defendant, who was standing in the sink area of the bathroom, encouraged D.D. to continue using the toilet, but she declined. Defendant stood blocking A.D.'s and D.D.'s exit. D.D. slid under defendant's arm and was able to leave the bathroom. D.D. turned around and saw that defendant's pants were unbuckled and his underwear was showing. D.D. ran downstairs to get help.

After D.D. left, defendant told A.D. that she could use the toilet if she needed to, but A.D. declined. Defendant pushed A.D. back and into the bathtub, causing her to hit her head. A.D. got up and stood in front of the bathtub. Defendant then grabbed at the waistband of her pants. Defendant tried to pull her pants and underwear down by hooking his thumbs over the waistband of her pants, touching her skin in the process. A.D. resisted by pulling up her pants. Defendant then grabbed towards A.D.'s upper thigh, grazing her leg in the process and causing A.D. to swat defendant's hands away.

Defendant's wife called for him from downstairs and defendant yelled for her to leave them alone and that they were fine. D.D. then appeared outside of the bathroom, grabbed A.D., and they both ran downstairs into a closet. A.D. told D.D. what had happened and then reported the incident to multiple adults.

At trial, defendant and his wife testified he was drinking beer and shots of liquor at the party. She testified defendant was with her nearly the entire night, except when he went to the bathroom. Defendant testified he never followed A.D. and D.D. upstairs, nor did he ever go upstairs during the party. He also testified that he never picked up or tickled any of the children.

The jury convicted defendant of one count of lewd and lascivious acts on a child under 14 years old. The jury further found true aggravating circumstances that defendant's victim was particularly vulnerable and his conduct indicated a serious danger to society. The court imposed the upper term of eight years.

Defendant appeals.

DISCUSSION

I

*The Trial Court Did Not Err By Reseating Juror No. 1*

Defendant contends the trial court erred by reseating Juror No. 1 after it brought and sustained its own motion under Code of Civil Procedure section 231.7. We disagree.

A

*Background*

As part of jury selection, the trial court asked prospective jurors several questions about themselves and their ability to give defendant a fair trial. As it related to Juror No. 1, she said she was a retired state worker who had served on two prior juries—one in the 1970's and one in the 1990's—and was the foreperson on both juries. She credited her selection as a foreperson to the fact she was organized and could ensure a process in which everyone was heard. During defense counsel's questioning, he asked jurors about how they assessed the credibility of children. Counsel specifically asked Juror No. 1 about her handling of fights between her own children. Juror No. 1 said she listened to both sides of the argument and then, if she could not get a clear understanding of what happened, would treat both children the same. Defense counsel followed this answer by asking whether Juror No. 1 would be able to deliver a verdict of not guilty in a trial involving a 10-year-old girl if she was not satisfied that an element had been proven. Juror No. 1 responded, "Yes. I understand the concept of reasonable doubt, and I understand the burden of proof in a case like this." Counsel then went on to explain to all the jurors the responsibility of each juror to come to an independent conclusion.

Neither party exercised for-cause challenges, and the prosecution did not exercise any peremptory challenges. For its first peremptory challenge, the defense challenged a male juror. For its second peremptory challenge, the defense challenged Juror No. 1, a female juror. For its third challenge, the defense challenged a female juror who had voiced concerns about her ability to fairly listen to people accused of sexual assault.

4

Given the defense's challenge of two female jurors in a row, the court moved pursuant to Code of Civil Procedure section 231.7 for defense counsel to justify the decisions to challenge the two female jurors. Defense counsel said he challenged Juror No. 1 because of her response to how she resolved disputes between her children. According to counsel, because Juror No. 1 said she would treat her children the same if she could not tell what really happened, he was afraid she would find defendant guilty if she was uncertain about what really happened. Defense counsel also thought Juror No. 1 did not seem happy about the prospect of being on another jury.

The trial court disagreed with defense counsel that Juror No. 1's answer about how she treated her children demonstrated she would favor guilt in the face of uncertainty. According to the court, Juror No. 1 indicated she would find in favor of an acquittal if she did not know who to believe. The trial court also did not interpret Juror No. 1's demeanor as indicating she did not want to be on another trial. The court noted Juror No. 1 did not express any hesitancy. The court found defense counsel's reasons for challenging Juror No. 1 unsupported by its recollection of Juror No. 1's answers. After making that finding, the court found a substantial likelihood an objectively reasonable person would view Juror No. 1's gender as a factor in the use of defense counsel's peremptory challenge, and thus, the court reseated Juror No. 1. The court found the defense's reasons for challenging the other juror supported by the record and not in violation of Code of Civil Procedure section 231.7.

B

*Substantial Evidence Supports The Trial Court's Finding*

Code of Civil Procedure section 231.7, subdivision (a) provides, "A party shall not use a peremptory challenge to remove a prospective juror on the basis of the prospective juror's . . . gender." Once a party or the court objects to the improper use of a peremptory challenge, the party seeking to exercise the challenge must "state the reasons" for it. (§ 231.7, subds. (b)-(c).) The statute provides, "The court shall evaluate

5

the reasons given to justify the peremptory challenge in light of the totality of the circumstances," and "shall consider only the reasons actually given." (§ 231.7, subd. (d)(1).) "If the court determines there is a substantial likelihood that an objectively reasonable person would view . . . gender . . . as a factor in the use of the peremptory challenge, then the objection shall be sustained." (*Ibid.*) A " 'substantial likelihood' " is defined as "more than a mere possibility but less than a standard of more likely than not." (§ 231.7, subd. (d)(2)(B).) "In making its determination, the circumstances the court may consider include," "[w]hether the reason given by the party exercising the peremptory challenge was contrary to or unsupported by the record." (§ 231.7, subd. (d)(3)(F).)

The parties agree the provision in Code of Civil Procedure section 231.7 articulating the standard of review when an objection is denied also applies here, i.e., when an objection is made by the trial court and sustained. We will presume the parties are correct. Accordingly, we will review the trial court's ruling "de novo, with the trial court's express factual findings reviewed for substantial evidence. [We] shall not impute to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record. [We] shall consider only reasons actually given [for exercising the peremptory challenge] and shall not speculate as to or consider reasons that were not given to explain . . . the party's use of the peremptory challenge . . . . Should [we] determine that the objection was erroneously [granted], that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (§ 231.7, subd. (j).)

Defendant argues the use of two consecutive challenges on female jurors cannot support a finding that an objectively reasonable person would view gender as a factor in the use of a peremptory challenge. Defendant points to the high probability counsel would use two out of three challenges on female jurors in a row, and further argues the sample size of three jurors was too small to support the trial court's conclusion.

6

But this was not the only evidence on which the trial court relied. The court also considered the fact defense counsel's reasons for using a peremptory challenge were not supported by the record, which Code of Civil Procedure section 231.7, subdivision (d)(3)(F) expressly permits courts to consider when making a ruling under the section. The record further supports the trial court's finding in this regard. Juror No. 1 said she would treat her children the same if she could not tell who was responsible for a particular argument. This reasonably indicates Juror No. 1 would not punish one child over another when confronted with two reasonable sides of a story. Juror No. 1 further reiterated she was aware of the burden of proof and her obligation to find defendant not guilty if she was not satisfied that an element had been proved. The court could also not corroborate defense counsel's assertion that he observed Juror No. 1 look displeased at the prospect of serving on another jury.

Taken together, counsel's use of two consecutive peremptory challenges against female jurors and his assertion of reasons unsupported by the record provide more than a mere possibility that an objectively reasonable person would view gender as a factor in the use of the peremptory challenge against Juror No. 1.

II

*The Trial Court Did Not Err By Discharging*

*Juror No. 5 For Failing To Deliberate*

Defendant contends the trial court improperly discharged Juror No. 5 for failing to deliberate. We disagree.

A

*Background*

The jury was excused to begin its deliberation at 9:00 in the morning. At approximately 2:30 p.m. and 4:00 p.m. on the first day of jury deliberations, the jurors twice requested the clerk to read testimony back to them. On the morning of the second day of deliberations, the jury sent the trial court a note providing, "The jury is not able to

7

come to consensus. We have deliberated for [four plus] hours on the same issue. [Eleven] of the jurors have come to agreement based on the preponderance of the evidence; one juror has dissented and has stated nothing will change her mind. [¶] We are at an impasse. Next steps?" The court and counsel met with all the jurors and clarified the reasonable doubt standard as the prosecutor's burden of proof. The court then asked Juror No. 1, as the foreperson, whether she believed the nonparticipating juror, later revealed to be Juror No. 5, was refusing to deliberate or felt convinced that nothing would change her mind. Juror No. 1 stated, "After deliberating, [Juror No. 5] is convinced that nothing will change her mind." After speaking to counsel in chambers, the court suggested several options to the jury, of which Juror No. 1 indicated additional argument from counsel would be useful. The court sent the jury back to the deliberation room to identify topics it would like to hear more argument about.

Just after noon on the second day, the jury sent another note providing, "One juror states in [A.D.'s] testimony she was asked 'Did he touch you?' and she answered 'He did not.' The other jurors heard her testimony to include statements he did touch her. Upon the readback of that specific testimony, the jurors did not change their understanding of the testimony. Was [A.D.'s] testimony that [defendant] touched her?" The trial court asked the jury to "clarify if [it was] asking the lawyers to argue this point, or [was it] asking the [c]ourt to directly answer the question?" The jury clarified it was asking "the court [to] directly answer the question." The trial court responded, "The [c]ourt cannot instruct you on what factual determination to make. It is up to all of you to decide whether [A.D.] did or did not say that she was touched. However, if you would like [A.D.'s] testimony on this point read to you again, please let the [c]ourt know. In addition, please carefully review the [c]ourt's instruction [CALCRIM No.] 1110 . . . . This instruction explains what touching must be proved and what . . . defendant's intent must be at the time of any touching."

Soon thereafter, the jury sent another note providing, "The jury continues to be at impasse. One juror has indicated that she is not open to additional input or accept the parts of the testimony that do not agree with her conclusion. We see no further way forward." In discussion with counsel, the trial court suggested removing the juror, to which the prosecution agreed. Defense counsel disagreed, arguing the jury never followed up about further argument and appeared to have continued deliberating until it came up with a question of fact. To defense counsel, it appeared the jurors had made up their minds about the facts and 11 jurors thought one way and one juror thought another.

The trial court acknowledged the record at that point did not support removing Juror No. 5, absent a stipulation by the defense. The court agreed to inquire of the jurors but ask only whether they would like argument from counsel regarding the factual disagreement.

When the jurors returned, the trial court asked generally whether they would like additional argument from counsel. The court polled the jury about whether it wanted to hear argument about the subject matter of the prior question, i.e., whether defendant had touched A.D. All jurors except Juror No. 5 indicated they wanted to hear argument on that topic, with one juror stating argument would not change the mind of Juror No. 5. Both attorneys then reargued the issue of whether a touching of A.D. occurred as defined in the jury instructions.

Not long after, the jury sent another note providing, "One juror is not open to further discussion and does not engage in meaningful or impartial deliberations. She has repeatedly . . . asked to just be dismissed from the jury. [¶] The jury cannot reach consensus." In response to this question, the trial court spoke to Juror No. 1 in the presence of counsel and asked whether Juror No. 5 was "refusing to engage in further deliberation." Juror No. 1 answered in the affirmative. The court then asked whether anything had changed since Juror No. 1 was asked the same thing that morning. Juror No. 1 answered, "[Juror No. 5] was forthcoming with her opinion, but was not

9

responding to anyone else's, and when asked questions, would not answer them [and] when other jurors would ask her for clarification or for additional information or a reasoning behind her position, she was not forthcoming with anything, other than [to say] that's her position."

Juror No. 1 also said, "The beginning of the deliberation process, had everyone [gathered] around the room and [they] indicated their understanding and preliminary leaning, and shortly after that, she locked into a position and would not listen or reason with the rest of the jury on other possible conclusions." Juror No. 1 represented that when asked questions during back-and-forth discussions, Juror No. 5 would answer, but it would always be the same response. Juror No. 1 did not believe Juror No. 5 engaged in the deliberation process.

The trial court then spoke with five other jurors one by one. Juror No. 3 agreed with the jury's last note indicating a fellow juror refused to deliberate. Juror No. 3 indicated other jurors had attempted to engage with Juror No. 5, but Juror No. 5 would not answer questions directly and had been exhibiting this behavior since after lunch on the first day of deliberations. Juror No. 3 also said Juror No. 5 was not engaged in a give-and-take dialogue and confirmed Juror No. 5 had asked to be dismissed from the jury.

Juror No. 6 corroborated Juror No. 1's and Juror No. 3's statements regarding Juror No. 5, stating Juror No. 5 would not engage in discussion or answer questions posed since the first day of deliberations. Juror No. 8 agreed, stating Juror No. 5 did not engage in conversation about her views with other jurors since the beginning of deliberations. Juror No. 10 also agreed and stated Juror No. 5 had deliberated early in the process, but once the clerk reread testimony on the first day, Juror No. 5 stopped deliberating. Juror No. 12 agreed with the other jurors' assessments but added Juror No. 5 believed testimony existed that was not contained in the transcript read to the jury and Juror No. 5 disregarded evidence that contradicted her viewpoint.

Juror No. 5 agreed with the trial court that she was the juror referenced in the note. The court asked her several questions about whether she indicated to the other jurors that she wanted to be discharged from service. Juror No. 5 appeared confused in her answers or responded with questions and statements about her thoughts on the process of discharging a juror. When asked whether she had engaged in the deliberation process, Juror No. 5 said she had pointed the other jurors to why she decided a certain way and responded to questions posed to her. Juror No. 5 indicated she had made up her mind and was unwilling to deliberate further.

The trial court discharged Juror No. 5 because the six jurors it interviewed unanimously stated Juror No. 5 was not engaged in deliberation and failed to directly answer questions from near the beginning of the deliberation process, and the court confirmed Juror No. 5 was evasive and indirect when communicating. The court also made a credibility finding that Juror No. 5 was not being truthful when she told the court she engaged in the deliberation process and answered other jurors' questions. This finding was based on Juror No. 5's inability to "even answer the [c]ourt's questions throughout this process." The court stated, "She blurted out things that I told her not to. [¶] And so, based on what I've heard here today, I think it is without any doubt that she is refusing to deliberate and has really refused to deliberate meaningfully, it sounds like, from at least mid-day Friday through the end of the day."

Following the seating of an alternate juror, the jury reached a verdict of guilty after two and a half hours.

### B

*The Trial Court's Reasons For Discharging Juror No. 5*

*Are Supported By The Record To A Demonstrable Reality*

Under Penal Code section 1089, "[a] trial court may discharge a juror at any time during trial if the court finds that the juror is 'unable to perform his or her [or their] duty.' [Citation.] A juror who refuses to deliberate may be removed 'on the theory that such a

11

juror is "unable to perform [a juror's] duty" within the meaning of [section 1089].' "
(*People v. Armstrong* (2016) 1 Cal.5th 432, 450; see *People v. Cleveland* (2001)
25 Cal.4th 466, 475.) " 'A refusal to deliberate consists of a juror's unwillingness to
engage in the deliberative process; that is, [the juror] will not participate in discussions
with fellow jurors by listening to their views and by expressing [the juror's] own views.
Examples of refusal to deliberate include, but are not limited to, expressing a fixed
conclusion at the beginning of deliberations and refusing to consider other points of view,
refusing to speak to other jurors, and attempting to separate oneself physically from the
remainder of the jury. The circumstance that a juror does not deliberate well or relies
upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground
for discharge. Similarly, the circumstance that a juror disagrees with the majority of the
jury as to what the evidence shows, or how the law should be applied to the facts, or the
manner in which deliberations should be conducted does not constitute a refusal to
deliberate and is not a ground for discharge. A juror who has participated in deliberations
for a reasonable period of time may not be discharged for refusing to deliberate, simply
because the juror expresses the belief that further discussion will not alter [the juror's]
views.' " (*People v. Barton* (2020) 56 Cal.App.5th 496, 510-511 (*Barton*), quoting
*Cleveland*, at p. 485.) " 'It is not always easy for a juror to articulate the exact basis for
disagreement after a complicated trial, nor is it necessary that a juror do so. As [our
Supreme Court has] stated, it is not required that jurors deliberate well or skillfully.' "
(*Barton*, at p. 513.)

A trial court's decision to discharge a juror pursuant to Penal Code section 1089 is
reviewed for abuse of discretion under a " 'heightened standard [that] more fully reflects
an appellate court's obligation to protect a defendant's fundamental rights to due process
and to a fair trial by an unbiased jury.' " (*People v. Armstrong*, *supra*, 1 Cal.5th at
p. 450.) "[T]he juror's 'inability to perform' his or her [or their] duty 'must appear in the
record as a demonstrable reality.' " (*Ibid.*) This standard is " 'more comprehensive and

12

less deferential' " than the substantial evidence standard of review. (*Ibid*.) Instead of examining the record to determine whether there was reasonable, credible evidence of solid value upon which the trial court could have relied, we look at the evidence upon which the trial court actually did rely to determine whether it supports the trial court's conclusion in light of the entire record. (*Id*. at pp. 450-451; *People v. Jones* (2020) 50 Cal.App.5th 694, 701.)

" 'As [our Supreme Court has] consistently cautioned, however, even under the demonstrable reality standard the reviewing court does not reweigh the persuasive value of the evidence.' [Citation.] '[E]ven when there is conflicting evidence . . . an appellate court must recognize that it is for the trial court to "weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings," and the reviewing court must "defer to factual determinations based on these assessments." ' [Citation.] Accordingly, reviewing courts must defer to the trial court's assessments of a juror's credibility or mental and physical conditions, 'based "on firsthand observations unavailable to us on appeal." ' " (*Barton*, *supra*, 56 Cal.App.5th at pp. 509-510, italics omitted.)

Comparing his case to *Barton*, defendant argues the trial court erred by discharging Juror No. 5 from the jury because the record reflects she had deliberated for a reasonable amount of time and could simply not be convinced to change her mind. In *Barton*, the appellate court reversed a trial court's decision to discharge a juror, Juror No. 12, for refusing to deliberate, finding that the failure to deliberate did not appear as a demonstrable reality in the record. (*Barton*, *supra*, 56 Cal.App.5th at pp. 502, 509.) It held that coming to a conclusion early in the deliberation process does not show an unwillingness to deliberate *standing alone* but is relevant when considered with the other evidence of a juror's willingness to listen to the evidence or follow the court's instructions. (*Id*. at p. 513.) Here, the record reflects by a demonstrable reality, as it did in *Barton* (*id*. at pp. 503-507, 513), that Juror No. 5 came to a quick conclusion. Juror

13

No. 1 stated Juror No. 5 shared her preliminary thoughts and then shortly after "locked into a position and would not listen or reason with the rest of the jury on other possible conclusions." The jurors who spoke about the timing of Juror No. 5's conclusions unanimously agreed Juror No. 5 committed to her position around lunch of the first day, about three hours after the start of deliberations and only after introductions and preliminary thoughts had been shared.

Defendant argues his case is even more like *Barton* because, like the discharged juror in *Barton* who also quickly formed a conclusion, the record does not support by a demonstrable reality that Juror No. 5 refused to listen to other jurors or consider the evidence. When concluding Juror No. 12 participated in deliberations despite her quick conclusion, the *Barton* court faulted the trial court for permitting counsel to lead the questioning of jurors and for giving undue weight to the other jurors' opinions that Juror No. 12 had failed to deliberate, as opposed to focusing on Juror No. 12's actual conduct. (*Barton*, *supra*, 56 Cal.App.5th at pp. 511, 512.) The appellate court also interpreted the record to reveal that the jurors merely disagreed with Juror No. 12's ultimate opinion regarding the evidence. (*Id*. at pp. 512-513.) In *Barton*, the other jurors told the court when describing Juror No. 12's participation in deliberations that she would not talk openly and freely but would share her opinions, appeared to be considering other opinions but would not provide reasons for her own opinions, would answer questions unsatisfactorily or repeat the answer over and over again, referenced her notes and other evidence, and was not acting reasonably. (*Id*. at pp. 504-507.) Taken together, the record supported the conclusion the other jurors merely disagreed with Juror No. 12's verdicts. (*Id*. at pp. 512-513.)

Here, the jurors indicated Juror No. 5 was forthcoming with her preliminary opinion but did not listen to the opinions of others or answer questions except to say the same thing repeatedly or that she had made up her mind. Jurors also indicated Juror No. 5 did not engage in the deliberation process by explaining herself and she refused to

14

consider the evidence as a whole or believed evidence existed that was not contained in the transcript read to the jury. The trial court engaged with Juror No. 5 about whether she was answering questions posed by her fellow jurors and the resulting dialogue was confusing and rambling. Juror No. 5 further responded with information the court directly asked her not to talk about. All of this led the court to make a credibility finding that Juror No. 5 lied when she said she responded to other jurors' questions and listened to their points of view. In other words, the trial court found Juror No. 5 lied about engaging in the deliberative process of sharing her views and listening to other jurors' views.

As an initial matter, we address defendant's argument in his reply brief that this finding was not supported by a demonstrable reality because Juror No. 5's response to the trial court's question should have been obvious and her refusal to answer the court with a yes or no is not indicative of a failure to deliberate. While a juror's refusal to answer yes-or-no questions during deliberations is not grounds to discharge a juror (*Barton*, *supra*, 56 Cal.App.5th at pp. 510-511), it is grounds to assess a juror's willingness to engage in questioning and the deliberative process in general. The record demonstrates Juror No. 5 did not track the court's questions or coherently answer them, even when redirected or guided to do so. And she ignored explicit direction on permissible topics to reveal to the court. It was reasonable for the court to conclude its interaction with Juror No. 5 was representative of the other jurors' interactions with her, and she could not confine herself to permissible avenues of inquiry or consideration. Indeed, a juror indicated Juror No. 5 relied on nonexistent evidence, while another juror said Juror No. 5 did not consider the evidence as a whole. Thus, evidence supports the trial court's factual finding that Juror No. 5 did not answer questions posed by other jurors or consider other points of view during deliberations. (See *id*. at pp. 509-511.)

Given the trial court's factual findings and the other jurors' statements regarding Juror No. 5's conduct before and after lunch on the first day of deliberations, the record

15

supports the trial court's conclusion by a demonstrable reality that Juror No. 5 failed to participate in juror deliberations, making defendant's case distinguishable from *Barton*. First, unlike *Barton*, the court inquired of the jurors on its own and did not rely on the parties to dictate the inquiry. Thus, the court eliminated the possibility the inquiry was tainted by party bias. (*Barton*, *supra*, 56 Cal.App.5th at pp. 511, 512.) Second, unlike *Barton* where Juror No. 12 answered questions posed to the juror, Juror No. 5's answers were rambling and off topic, leading to a credibility finding that she did not answer questions of her fellow jurors or consider their points of view and admissible evidence. (*Id*. at p. 514.)

Third, the other jurors' statements to the court demonstrated that Juror No. 5 made up her mind after preliminary thoughts were shared and without first considering other viewpoints. While jurors may express fixed opinions early in deliberations, they must still show a willingness to consider other viewpoints after expressing the fixed opinion. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1352.) The other jurors, and the court, believed further deliberation was warranted beyond sharing "preliminary leaning[s]," as Juror No. 1 put it. During subsequent conversations, Juror No. 5 failed to engage with her fellow jurors by answering questions or listening to their viewpoints, much like she did when speaking with the court. She further declined to hear arguments from counsel and refused to continue to deliberate when asked to by the court. Accordingly, in addition to the record showing by a demonstrable reality that Juror No. 5 came to a quick conclusion, it also provides support by a demonstrable reality that Juror No. 5 refused to deliberate.

III

*Admission Of Defendant's Prior Bad Act Did*

*Not Violate Evidence Code Section 352*

Defendant contends the trial court abused its discretion by admitting evidence of his prior juvenile adjudication because the danger of undue prejudice substantially outweighed the evidence's probative value. We disagree.

A

*Background*

As part of its in limine motions, the prosecution moved to admit evidence under Evidence Code sections 1108 and 1101, subdivision (b) of defendant's juvenile adjudication for sodomy. The prosecution proffered it could demonstrate defendant sodomized his three-year-old sister three times during one occasion when he was 15 years old. Following the incident, defendant told his sister to change her clothes. His mother, however, discovered the offense when she returned home and noticed his sister was bleeding. Defendant objected under section 352, relying predominantly on the fact that the conduct occurred 20 years before when defendant was a juvenile.

Given the overtly sexual nature of defendant's prior offense, the trial court believed it probative to defendant's propensity to commit sexual offenses, and thus the prior conduct was admissible under Evidence Code section 1108. The trial court also believed the offenses sufficiently similar to demonstrate defendant's sexual intent under section 1101, subdivision (b). To the trial court, defendant's clear sexual intent during the commission of the prior offense undercut the offense's remoteness. Further, it was not reasonable that evidence of the prior offense would bolster the evidence of the current charge, since the victim of the current charge reported defendant's conduct at the time the conduct occurred and to multiple people.

Still, the trial court believed admitting the details of defendant's prior conduct would be unduly prejudicial. The court proposed informing the jury only that defendant

17

had previously been convicted of lascivious conduct on a child under 14 years old. Defendant disagreed with the court's assessment because he did not want the jury to essentially be told he had previously held a lascivious intent when that was not an element of the prior offense. Defendant was further concerned with how his testimony would be interpreted if he was questioned about an offense that did not actually happen. Defendant argued that he would instead prefer to tell the jury the facts of his prior conduct and explain it for what it was.

After clarifying several times with defense counsel that he wished for defendant's actual offense to be admitted into evidence, the trial court agreed to defendant's request, stating it was doing so because of defendant's claim the evidence would directly affect the argument he planned to make. In the end, the court permitted the prosecution to elicit that, when defendant was 15 years old, he admitted to one count of sodomy against a child under the age of 14 years old and 10 years younger than defendant.

At trial, the child protective services employee assigned to the case testified that, when defendant was 15 years old, he was watching his siblings while his mother was at the store. He told his sister, who was under five years old, to come to the couch and turn around. He then "removed her pants and put his erect penis in her anus three times." Defendant told the employee about his conduct and did not appear to be lying when making his statements.

The jury was also instructed with the following stipulation: "On [December 12, 2001], the Kern County Juvenile Court sustained a petition against . . . defendant . . . for a felony violation of Penal Code [s]ection 286[, subdivision ](c)(1)."

B

*There Was No Abuse Of Discretion*

Propensity evidence is admissible in sex offense cases under Evidence Code section 1108 "if the evidence is not inadmissible pursuant to [s]ection 352." (§ 1108, subd. (a).) In other words, "[w]hen a defendant is accused of a sex offense, . . .

18

section 1108 permits the court to admit evidence of the defendant's commission of other sex offenses, thus allowing the jury to learn of the defendant's possible disposition to commit sex crimes." (*People v. Cordova* (2015) 62 Cal.4th 104, 132.) Such evidence "is presumed admissible and is to be excluded only if its prejudicial effect substantially outweighs its probative value in showing the defendant's disposition to commit the charged sex offense or other relevant matters." (*Ibid.*) Specifically, evidence is excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

"The prejudice [that] exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. . . . 'The "prejudice" referred to in . . . section 352 applies to evidence [that] uniquely tends to evoke an emotional bias against the defendant as an individual and [that] has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) We review a trial court's admission of evidence for abuse of discretion. (*People v. Loy* (2011) 52 Cal.4th 46, 61.)

The trial court admitted evidence of defendant's prior offense for the purpose of showing defendant had a propensity to commit a sexual offense as permitted by Evidence Code section 1108, which enumerates defendant's prior offense as an offense permitting a propensity inference. (§ 1108, subd. (d)(1)(A).) The facts of defendant's prior conduct are severe—isolating and sodomizing a very young child. Given these considerations, we cannot say it was unreasonable for the court to conclude defendant's prior offense held strong probative value of his propensity to commit a sexual offense. Still, given the time since the offense and lack of high similarity, the court wanted to sanitize the evidence to include only that defendant had previously been convicted of a sexual offense against a child under 14 years old. Defendant rejected that compromise in the trial court. On

appeal, he analyzes the prejudicial effect of the evidence in light of how it was elicited at trial. Given defendant's insistence on the state of the evidence, any claimed error regarding evidence admitted beyond the court's suggestion is forfeited, if not invited. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 [" 'The doctrine of invited error is designed to prevent [a defendant] from gaining a reversal on appeal because of an error made by the trial court at [the defendant's] behest. If defense counsel intentionally caused the trial court to err, the [defendant] cannot be heard to complain on appeal' "].) We will analyze the prejudicial effect of the evidence in light of how the court suggested it be admitted.

Evidence of defendant's prior offense was elicited through a single witness and did not threaten to consume much time of the overall trial. While the offense occurred 20 years prior, with the trial court's proposed limitation, the offense would not have involved penetration and would have been confined to a touching. True, the prior offense as proposed would have been more similar to the charged crime, but that is not the prejudice Evidence Code section 352 seeks to guard against. Section 352 is designed to protect a defendant against emotional bias caused by a particularly egregious or more inflammatory crime. (*People v. Karis*, *supra*, 46 Cal.3d at p. 638.) Here, the trial court sought to guard against that type of prejudice by limiting the inflammatory facts of defendant's prior offense while still acknowledging it was sexual in nature. Finally, defendant had been punished for his prior conduct, making it less likely the jury would seek to punish him for it by convicting him of the charged offense. (See *People v. Jones* (2011) 51 Cal.4th 346, 371-372 ["The fact that [the] defendant was convicted of the [uncharged act] reduced any prejudicial effect"].)

On balance, it was reasonable to conclude the prejudicial effect of admitting defendant's prior offense as a lewd and lascivious act on a child under 14 years old did not outweigh the probative value of demonstrating his propensity to commit a sexual offense. Accordingly, there is no abuse of discretion.

20

IV

*Sufficient Evidence Supports The Jury's Finding*

*That Defendant's Victim Was Particularly Vulnerable*

Defendant contends sufficient evidence does not support the jury's finding that his victim was particularly vulnerable because there was nothing about his crime that was distinctively worse than the ordinary. We disagree.

We review a jury's findings on aggravating sentencing factors for substantial evidence. We review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence from which a reasonable fact finder could find the aggravating factor true beyond a reasonable doubt. (See *People v. Wilson* (2008) 44 Cal.4th 758, 806.) We presume every fact in support of the judgment that the jury reasonably could have found from the evidence. (*Ibid.*) We do not reweigh the evidence or reevaluate the credibility of witnesses. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) " ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

For purposes of the particularly vulnerable victim aggravating sentencing factor under California Rules of Court, rule 4.421(a)(3), " ' "[p]articularly . . . means in a special or unusual degree, to an extent greater than in other cases." ' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 154.) " ' "Vulnerabl[e] means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." ' " (*Ibid.*)

A victim may be deemed particularly vulnerable for reasons other than age, including the circumstances of the crime. (*People v. Carpenter* (1997) 15 Cal.4th 312, 413, abrogated on other grounds in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.) For instance, a victim may be particularly vulnerable because the victim is significantly

21

smaller than the defendant (*People v. King* (2010) 183 Cal.App.4th 1281, 1323), alone in an isolated area with the defendant (*Carpenter*, at p. 413), attacked in his or her or their own home (*People v. Hall* (1988) 199 Cal.App.3d 914, 922), or taken by surprise by the defendant (*People v. Smith* (1979) 94 Cal.App.3d 433, 435). Whether a victim is particularly vulnerable "is determined in the light of the 'total milieu in which the commission of the crime occurred.' " (*People v. Dancer* (1996) 45 Cal.App.4th 1677, 1694, disapproved on other grounds in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123.)

Substantial evidence supports the jury's finding that A.D. was a particularly vulnerable victim when defendant committed the lewd act against her. Defendant isolated A.D. in a bathroom and physically wrestled with her to pull down her pants and underwear. A.D. was able to stop defendant, despite being much younger. This occurred in A.D.'s family member's home during a party attended by multiple family members, where A.D. felt safe and secure, and after defendant lulled A.D. into a false sense of security by playing a game with her and D.D. In light of these circumstances, a jury reasonably could have found that A.D. was a particularly vulnerable victim.

DISPOSITION

The judgment is affirmed.

/s/_____<br>ROBIE, Acting P. J.

I concur:

/s/_____<br>MAURO, J.

22

FEINBERG, J., Dissenting.

Removal of a seated juror for failing to deliberate "is a serious matter that implicates a defendant's state and federal constitutional right to a unanimous decision by the jury." (*People v. Armstrong* (2016) 1 Cal.5th 432, 454 (*Armstrong*).) To uphold a juror's discharge, a reviewing court must be confident that the trial court's decision is manifestly supported by the record. (*People v. McGhee* (2025) 17 Cal.5th 612, 628 (*McGhee*).) In my view, the record in this case does not support the trial court's determination that Juror No. 5, the lone holdout juror, failed to deliberate on the charges against defendant Louis Olivarria. I therefore respectfully dissent from my colleagues' contrary conclusion.

As the majority recognizes (maj. opn. *ante*, at p. 12), a "juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485 (*Cleveland*).) While jurors must start deliberations with their minds "open to a fair consideration of the evidence, instructions," and opinions expressed by their peers (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 73), it is "not uncommon, or grounds for discharge, 'for a juror (or jurors) in a trial to come to a conclusion about the strength of a prosecution's case early in the deliberative process and then refuse to change his or her mind despite the persuasive powers of the remaining jurors.' " (*Armstrong*, *supra*, 1 Cal.5th at p. 453, quoting *People v. Bowers* (2001) 87 Cal.App.4th 722, 734.) Once a juror has reached that conclusion for him or herself, the juror may not be discharged "for failing to agree with the majority of other jurors or for persisting in expressing doubts about the sufficiency of the evidence in support of the majority view." (*People v. Engelman* (2002) 28 Cal.4th 436, 446.)

In this case, the trial court's finding that Juror No. 5 "really refused to deliberate meaningfully, it sounds like, *from at least mid-day Friday*" (italics added; maj. opn. *ante*,

1

at p. 11) acknowledges that Juror No. 5 did, in fact, deliberate for at least some number of hours. On the facts here, that was "a reasonable period of time," after which she could not be discharged for refusing to change her mind. (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)

As the majority notes, the jury began its deliberations at 9:00 a.m. on a Friday. (Maj. opn. *ante*, at p. 7.) Twice that afternoon, the jury requested readbacks of portions of A.D.'s testimony. At 10:15 a.m. the following Monday, about one hour after deliberations had resumed, the jury sent Jury Question No. 3, stating: "The jury is not able to come to consensus. We have deliberated for 4+ hours on the same issue. 11 of the jurors have come to agreement based on the preponderance of the evidence; One juror has dissented and has stated nothing will change her mind. [¶] We are at an impasse. Next steps?" When asked by the trial court about this note and specifically whether the dissenting juror "is refusing to participate, that is refusing to deliberate, or are you just saying, after deliberating, that juror feels convinced that nothing will change her mind?," the foreperson answered that it was the latter: "*After deliberating*, that juror is convinced that nothing will change her mind." (Italics added.) Significantly, after hearing this report from the foreperson and receiving additional notes from the jury, the court concluded that if Juror No. 5 were discharged at that point, "it would likely be error." The court observed: "I did ask that question to the foreperson, and she indicated it to the contrary. She said that [Juror No. 5] was participating and did participate, but she just did have a differing opinion." These facts demonstrate, consistent with the trial court's at least implicit finding, that the jury, including Juror No. 5, deliberated for a reasonable period of time before Juror No. 5 made her decision.

Juror No. 10's observations support this conclusion as well. When the trial court asked whether Juror No. 5 "was deliberating earlier [i]n the day on Friday," Juror No. 10 answered: "Yes. So earlier, yes, that's why we had the court reporter come in a couple of times to re-read, you know, some things for us. And then I believe towards the end of

2

the day, that's when it was just shut off, all type of communication as far as deliberation and as far as trying to understand her reasoning to get her input on her thought process and reasoning of what the court reporter read off." And in answering the court's later question whether Juror No. 5 was "engaged in meaningful or impartial deliberations," Juror No. 10 said, "[a]t first, when we first started deliberating on Friday, I would say yes. After the court reporter came in and read off some statements we were particularly asking about, I would say after that, no."

The majority discounts the evidence of Juror No. 5's early participation in the deliberative process as having occurred while jurors were merely sharing their "preliminary thoughts," by which the majority appears to be concluding that the early discussions did not amount to true "deliberations." (Maj. opn. *ante*, at pp. 14-16.) But the trial court did not make a finding that the early period of deliberations was only "preliminary" or fell short of actually "deliberating." Rather, the majority's conclusion appears to be based on the foreperson's testimony that, at the "beginning of the deliberation process," all of the jurors "indicated their understanding and *preliminary leaning*, and shortly after that, [Juror No. 5] locked into a position and would not listen or reason with the rest of the jury on other possible conclusions." (Italics added; maj. opn. *ante*, at p. 10.) The trial court, however, "did not specifically credit these comments" by the foreperson (*McGhee*, *supra*, 17 Cal.5th at p. 644) or make a finding that it was discounting any portion of the deliberation period as merely "preliminary." That is significant, because "[o]ur review focuses on the evidence on which the trial court '*actually relied*' in its ruling." (*Ibid.*, italics added; see also *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052 [demonstrable reality test "requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion" that misconduct was established]; *Armstrong*, *supra*, 1 Cal.5th at p. 451 [avoiding reliance on jury note that trial court never referred to during hearing and inferring from the omission that "the court did not actually rely on the note" to reach its discharge

3

decision].)  Because the trial court did not make a finding that the first part of deliberations was "preliminary" or otherwise rely on the foreperson's use of that word, we cannot rely on that rationale to uphold the discharge decision.

But even had the trial court seen the early deliberations as "preliminary," the record does not support to a demonstrable reality that these discussions were insufficient under the relevant legal standards.  To begin with, the foreperson's statement does not reveal how much time or deliberation passed before Juror No. 5 reportedly "locked into" her position.  Moreover, the record shows that after approximately five hours and then seven hours into the deliberation period, around 2:30 p.m. and 4:00 p.m. on Friday respectively, the jury requested readbacks of portions of testimony specific to the issue (as later revealed) that Juror No. 5 viewed differently than her colleagues.  These requests for testimony readbacks reflect a jury substantively wrestling with the details of the case, not merely sharing "preliminary thoughts" or doing anything other than "deliberating."  Further, according to Jury Question No. 3, the "4+ hours" during which the jury "deliberated" "on the same issue" was long enough for "11 of the jurors [to] have come to agreement" (albeit under the wrong burden of proof) and for Juror No. 5 to have "dissented."  Nothing in that report suggests that the 11 jurors' "agreement" and Juror No. 5's "dissent[]" were mere "preliminary" positions.  Rather, this note indicates that enough time had passed and enough discussion had occurred for all of the jurors to have substantively considered the evidence in the case.

Significantly, this was a single-count case that required the jury's assessment of two percipient witnesses (A.D. and Olivarria) to decide a single contested issue:  whether Olivarria touched A.D. within the meaning of Penal Code section 288, subdivision (a).  Indeed, after Juror No. 5 was substituted, it took the newly constituted jury only two and a half hours to complete its entire deliberations and reach its guilty verdict.

In *People v. Barton* (2020) 56 Cal.App.5th 496, 514 (*Barton*), the appellate court addressed similar facts, concluding that, just as the jury "could reasonably reach a

4

decision within a few hours" after a new juror was seated, the discharged juror in that case "could reasonably reach her conclusion that [the defendant] was not guilty within a few hours." The same is true here. Juror No. 5 could, within the period from 9:00 a.m. to "mid-day Friday," reasonably reach her conclusion, just as the reconstituted jury could reasonably reach its own after two and a half hours. That Juror No. 5 "refused to change her mind" after that period of time was not grounds for discharge. (*Armstrong*, *supra*, 1 Cal.5th at p. 453.)

Beyond these early deliberations, I also respectfully disagree with my colleagues that the record supports to a demonstrable reality the trial court's conclusion that Juror No. 5 failed to participate in deliberations. (Maj. opn. *ante*, at pp. 15-16.) The trial court rested its conclusion, at least in substantial part, on the fact that, "[u]nanimously, the [interviewed] jurors agreed that [Juror No. 5] has not engaged in meaningful deliberations." This observation is factually true, but our Supreme Court has repeatedly admonished that " 'a trial court should be wary of relying on the opinions of jurors, rather than on its own consideration of objective facts.' " (*McGhee*, *supra*, 17 Cal.5th at p. 637, quoting *People v. Allen and Johnson*, *supra*, 53 Cal.4th at p. 75.)

The Court of Appeal in *Barton* recognized this when similarly reviewing a juror's discharge that was based in part on all 11 other jurors voicing the "ultimate opinion" that the juror in question was refusing to deliberate. (*Barton*, *supra*, 56 Cal.App.5th at p. 511.) Acknowledging the dangers of relying on juror opinion, the *Barton* court "[s]et[] aside the jurors' opinions" regarding the discharged juror and focused instead on the substance of the jurors' testimony about their colleague's conduct. (*Id.* at p. 512.) The court reasoned: " 'It is difficult enough for a trial court to determine whether a juror actually is refusing to deliberate or instead simply disagrees with the majority view. [Citations.] Drawing this distinction may be even more difficult for jurors who, confident of their own good faith and understanding of the evidence and the court's instructions on the law, mistakenly may believe that those individuals who steadfastly

5

disagree with them are refusing to deliberate or are intentionally disregarding the law.' " (*Ibid.*, quoting *People v. Engelman*, *supra*, 28 Cal.4th at p. 446.)  The majority distinguishes *Barton* on the ground that, unlike in that case, the trial court here did not rely on the parties to dictate the inquiry into the jury's deliberations (maj. opn. *ante*, at p. 16), but in doing so overlooks this separate shortcoming in the trial court's ruling.

Focusing on the evidence of Juror No. 5's conduct, the record lacks manifest support for the conclusion that Juror No. 5 refused to deliberate.  It is true that, in their interviews with the trial court, jurors uniformly expressed struggles and frustration in communicating with Juror No. 5.  But the record makes clear that a dialogue nonetheless occurred.  (See *Cleveland*, *supra*, 25 Cal.4th at p. 485 [deliberating consists of juror "participat[ing] in discussions with fellow jurors by listening to their views and by expressing . . . her own views"].)  For one thing, the jury notes show that Juror No. 5 exchanged views with her peers about the evidence in the case.  Most clearly, Jury Question No. 4, received by the trial court around noon on Monday, said:  "One juror states in [A.D.]'s testimony she was asked 'Did he touch you?'  and she answered 'He did not.'  The other jurors heard her testimony to include statements he did touch her. Upon the readback of that specific testimony, the jurors did not change their understanding of the testimony.  Was [A.D.]'s testimony that [Olivarria] touched her?" The "[o]ne juror" was Juror No. 5, and this note confirms that she was stating her interpretation of evidence to her colleagues.

Reports from other jurors show the same.  As our Supreme Court has explained, for fellow jurors to be "able to articulate" another juror's position, that juror "must have been engaging in the deliberative process."  (*McGhee*, *supra*, 17 Cal.5th at p. 634.)  In other words, a "juror's ability to describe to the court the views of the challenged juror showed there was some discussion going on."  (*Ibid.*, citing *United States v. Litwin* (9th Cir. 2020) 972 F.3d 1155, 1176.)  That is the situation here.  For example, when asked whether Juror No. 5 had been engaging in any type of dialogue, Juror No. 6 answered in

6

the negative but then explained: "[Juror No. 5] was just—for lack of a better word, I said to her, at one point, you're missing the forest—you're so focused on one thing and you're not seeing the forest. You're just focused on one thing. And I had mentioned to her that you have to look at everything. You have to consider numerous factors, not just one thing." Similarly, Juror No. 3 described Juror No. 5 as "stuck in one gear" and "not willing to move out of that" or "consider anything else." And Juror No. 12 said that "no matter how many times we had the readbacks, [Juror No. 5] doesn't believe what is written on the script. She thinks that there's something in there that wasn't recorded." These statements demonstrate that Juror No. 5 explained her view of the case—albeit a view with which other jurors disagreed or regarded as unduly focused on one aspect of the evidence. And "the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts . . . does not constitute a refusal to deliberate and is not a ground for discharge." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)

The majority emphasizes Juror No. 5's difficulties in answering questions when she was interviewed by the trial court. (Maj. opn. *ante*, at pp. 15-16.) The majority recognizes that a juror's refusal to answer yes-or-no questions during deliberations is not an adequate basis for excusing a juror, but it reasons that her "rambling and off topic" responses support the trial court's findings. (Maj. opn. *ante*, at p. 16.) Even accepting this characterization of Juror No. 5's colloquy with the trial court and the inference that it was representative of other jurors' interactions with her (maj. opn. *ante*, at pp. 15-16), at most that demonstrates a failure to deliberate *well*—not a failure to deliberate at all. (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)

Our state high court has explained that "[i]t is not always easy for a juror to articulate the exact basis for disagreement after a complicated trial, nor is it necessary that a juror do so." (*People v. Engelman*, *supra*, 28 Cal.4th at p. 446.) In other words, "it is not required that jurors deliberate well or skillfully." (*Ibid.*) With respect to Juror

7

No. 5's ability to respond to questions, Juror No. 6 flatly stated that Juror No. 5 "would not answer questions" from other jurors. Juror No. 12, however, reported that Juror No. 5 "would be indirectly answering, but it's not actually the question, but she's referring to the ones that she is sticking to most. So she's referencing to the ones that she believes that she thinks actually happened . . . ." The foreperson said that Juror No. 5 "was forthcoming with her opinion" and "when other jurors would ask her for clarification or for additional information or a reasoning behind her position, she was not forthcoming with anything, other than that's her position." According to the foreperson, Juror No. 5 would "state her opinion" but would not "directly" answer questions or answer "yes-or-no" questions. Juror No. 5 "would respond to the questions, but her response was always the same." Juror No. 3 said that Juror No. 5 did not answer questions "directly" and did not explain herself "in a rational manner." Juror No. 10 stated that jurors "listened to what [Juror No. 5] had to say" and that "[s]he talked, but nothing was really said."

These reports and those I have previously discussed are like those aired in *Cleveland*, *supra*, 25 Cal.4th 466, *McGhee*, *supra*, 17 Cal.5th 612, and *Barton*, *supra*, 56 Cal.App.5th 496, where the records were held insufficient to justify discharging the jurors at issue in those cases. In *Cleveland*, jurors complained that the challenged juror "discussed matters that they considered 'irrelevant' and adopted an 'unreasonable interpretation' based upon 'his own personal opinion.' " (*Cleveland*, at p. 486.) There were further reports that he would discuss matters " 'that had nothing to do with the facts at hand or the case' "; that he was " 'making judgments and speculations based on his personal feelings' "; that he was " 'disregarding the facts altogether' "; that he " 'won't answer the questions' " and instead " 'goes off on a tangent of something else every time' "; that he responded to questions about the elements of the crime by saying, " ' "I cannot answer with a yes or no" and go[ing] into a really big synopsis of what he speculates' "; that " 'he won't answer the question,' " saying " 'I've said all I want to say, I won't answer no questions' "; and that he " 'talks and talks and talks about everything

8

except what we are supposed to be dealing with.' " (*Id.* at pp. 471-472.) Likewise, in *McGhee*, it was reported that the discharged juror "was 'just going to go one way and stick to it and not make any sense [of] it or try to explain . . . it' "; that he "contradicted the other jurors with 'just a few words without really engaging in conversation' "; that he "was 'not considering what others say about the evidence' "; and that the jurors "trying to reason with [him] are 'just going around in circles.' " (*McGhee*, at p. 635.) And in *Barton*, jurors complained that the challenged juror repeatedly stated her opinion, " 'an opinion about one thing,' " without presenting her reasoning and expressed frustration that she " 'kept saying the same thing.' " (*Barton*, at p. 512.) In these cases, the reviewing courts recognized these complaints as taking issue with the quality of the juror's communication or the fact of the juror's continued disagreement with other panel members. (*Cleveland*, at p. 486 ["the juror simply viewed the evidence differently from the way the rest of the jury viewed it"]; *McGhee*, at p. 635 ["a key source" of frustration was discharged juror's "disagreement with the other jurors' views of the prosecution's evidence"]; *Barton*, at pp. 512-513 ["Simply because the other jurors were not satisfied with her opinion and the quality of her reasoning does not support a finding that she was refusing to deliberate"].) They did not manifestly support a finding of refusal to deliberate. (*Cleveland*, at pp. 485-486; *McGhee*, at pp. 635-636; *Barton*, at pp. 512-513.)

The majority's reasoning reflects a similar flaw. The majority faults Juror No. 5 for veering "off topic" when answering the trial court's questions, for her "confusing and rambling" dialogue with the court in which she "did not track the court's questions or coherently answer them," for repeating the same answers to questions from her peers, for "rel[ying] on nonexistent evidence," and for "not consider[ing] the evidence as a whole." (Maj. opn. *ante*, at pp. 14-16.) But those are all criticisms of the quality and content of a juror's deliberations. They amount to a failure to "deliberate well" and do not support a finding that Juror No. 5 did not deliberate at all. (*Cleveland*, *supra*, 25 Cal.4th at p. 485

9

["circumstance that a juror does not deliberate well or relies upon faulty logic or analysis" not ground for discharge].)

The trial court's adverse credibility finding also does not provide manifest support for the discharge decision. As the majority notes (maj. opn. *ante*, at p. 11), the trial court found that Juror No. 5 "lied to the Court about her deliberations." The court explained: "I don't believe her when she says that she always answered the questions and answered all the questions [of her peers], because she couldn't even answer the Court's questions throughout this process where I asked her questions." As in *McGhee*, close examination of the transcript gives reason to discount this determination. (*McGhee*, *supra*, 17 Cal.5th at p. 639 [discounting trial court's adverse credibility determination based on "a closer examination of the record and the jurors' remarks"].) The transcript shows that Juror No. 5's responses to the court's questions were in many cases indirect and inarticulate, and in some cases off point, but they were answers. But even deferring to the trial court's credibility finding in light of the trial judge's firsthand observations (*Armstrong*, *supra*, 1 Cal.5th at p. 451) and thus discarding all of Juror No. 5's testimony, the accounts of other jurors, as explained above, demonstrate that Juror No. 5 *did* answer questions from her peers, even if unskillfully. And as our state Supreme Court held decades ago, there is no refusal to deliberate when a juror is "attempting to explain, however inarticulately, the basis for [her] conclusion" and "listen[ing], even if less than sympathetically, to the contrary views of [her] fellow jurors." (*Cleveland*, *supra*, 25 Cal.4th at p. 486.)

Finally, I respectfully disagree with my colleagues that Juror No. 5's vote not to hear additional arguments from counsel and her statements to the trial court that she would have difficulty returning to deliberate after the court's juror interviews (maj. opn. *ante*, at p. 16) support the decision to excuse her. By that point, late in the afternoon on Monday, Juror No. 5 and the rest of the jury had deliberated for at least a day and a half. Even assuming the record supports the view that Juror No. 5's statements to the court reflect a refusal to return to the jury room and deliberate further, by that point—after the

10

central evidentiary issues had been discussed, the key testimony read back, and all twelve jurors had reached a conclusion about their view of the evidence—her unwillingness to engage further was not a ground to discharge her. (*Armstrong*, *supra*, 1 Cal.5th at p. 453 [that discharged juror "was not willing to engage in further discussion, by itself, does not show as a demonstrable reality that she was failing to deliberate," for a juror is permitted to " 'come to a conclusion about the strength of a prosecution's case early in the deliberative process and then refuse to change his or her mind' "].)

Juror No. 5 was the lone holdout against a guilty verdict. As she herself put it: "They are . . . 11 and I'm the one." Because the record fails to support as a demonstrable reality that Juror No. 5 refused to deliberate, the trial court abused its discretion in discharging her, and reversal of the judgment is therefore required. (*McGhee*, *supra*, 17 Cal.5th at p. 644; *Armstrong, supra*, 1 Cal.5th at p. 454.) Because my colleagues reach a different conclusion, I respectfully dissent.

/s/_____
FEINBERG, J.

11